Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 2779 | DATE | Mar. 14, 2002 |
| CASE TITLE | B. Michael Schneider, et al v County of Will, State of Ill. et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing set for 4/18/02, at 9:00 a.m.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Memorandum opinion and order entered. Defendants' motion to dismiss with respect to plaintiffs' claim under the associateion provision of the ADA is denied. Defendants' motion to dismiss all other claims is granted. Defendants' answer to the remaining claim is due by 4/11/02.
(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| X | Notices mailed by judge's staff. | | 3/21/02 date docketed | |
| | Notified counsel by telephone. | | | 14 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| GDS | courtroom deputy's initials | 02 MAR 20 AM 11:00 Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

B. MICHAEL SCHNEIDER and JANINE L. )
BALLY, )
)
Plaintiffs, )
) No. 01 C 2779
v. )
) Judge Robert W. Gettleman
COUNTY OF WILL, STATE OF ILLINOIS, )
Will County Board Members RICHARD )
BRANDOLINO, RICHARD BUDDE, WILLIAM )
BRUIN, W. LEE DEUTSCHE, MARY ANN )
GEARHART, JAMES MOUSTIS, GLENN )
WARNING, ANN DRALLE, SUSAN RILEY, )
MARIANNE KOZLIK, TERRI WINTERMUTE, )
JAMES BLACKBURN, KAREN CALLANAN, )
JOHN GERL, JAMES GALE, KERRY )
SHERIDAN, STEPHEN WILHELMI, )
KATHLEEN KONICKI, LAWRENCE )
TROUTMAN, SUZI WIBERG, HENRY TRAVIS )
and JOSEPH MIKAN, in their official capacities )
as Members of the Will County Board, )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

This four count complaint was filed pro se, by B. Michael Schneider ("Schneider") and Janine L. Bally ("Bally") against Will County, Illinois and twenty-three members of the Will County Board in their official capacities. The complaint alleges that, in denying plaintiffs a special use permit and failing to rule on their remodeling permit for the creation of a bed and breakfast near a veteran's cemetery, the defendants have violated the Fair Housing Act of 1989, 42 U.S.C. § 3604, et seq. (FHA) and the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq. (ADA), and have denied plaintiffs of their constitutional due process and equal protection rights. U.S. Const. Amends. 5, 14.

Defendants have filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). For the purposes of the motion, the court accepts the factual allegations of the complaint as true and draws all reasonable inferences in favor of the plaintiff. See Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1428 (7th Cir. 1996). The facts alleged by plaintiffs are set forth below.

**Factual Background**

On March 17, 1999, Bally purchased the property at 1200 Old New Lenox Road, in Joliet, Illinois out of foreclosure from the Veterans Administration, in anticipation of building and operating a bed and breakfast there. When the property was purchased, on it stood a three bedroom farmhouse zoned R-4 residential, and a detached barn, zoned A-2 agricultural.

Plaintiff Schneider is the intended lessee of the land. He planned to operate the bed and breakfast, paying Bally $1,200 a month in rent, plus half of the operating profits. Additionally, Schneider and Bally agreed that Schneider would remodel both structures, which they apparently needed, because in July 1999, the Will County Building Department deemed the farmhouse unfit for occupancy. The bed and breakfast was to have two of its five planned rooms be handicapped-accessible.

Plaintiffs allege that they bought the land relying on an interpretation of a Will County ordinance, specifically allowing the operator of a bed and breakfast to live on contiguous property rather than in the bed and breakfast itself, and allowing for a maximum of five bedrooms in the bed and breakfast. This interpretation was later "reversed" by apparently another official interpretation of the same ordinance, requiring that an operator live on the bed and breakfast premises. In any event, in July 1999, plaintiffs filed for a rehabilitation permit and

2

a special use permit, which are the subject of this litigation. The Will County Building Department refused to complete the processing of plaintiffs' remodeling permit application in August 1999, and as far as this court is aware, it has yet to be processed. Plaintiffs have sought an injunction in Illinois Circuit Court to compel issuance of the remodeling permit.

On August 3, 1999, Schneider appeared before the Will County Planning and Zoning Commission at a public factfinding hearing on plaintiffs' application for a special use permit. Schneider provided the Commission with an endorsement petition signed by the neighbors adjacent to the east, as well as those directly across the street. Two neighbors also appeared that day to offer testimony supporting plaintiffs' application. However, the Committee chairman allegedly allowed only those in opposition to speak. Indeed, one County Commissioner attempted to propose a formal motion in favor of the proposed bed and breakfast with amendments, but was not allowed to speak, either. Plaintiffs allege that they were not allowed to cross-examine those who opposed granting the permit. Plaintiffs also complain that no evidence was presented that showed or implied a possible detrimental effect on neighboring property owners. Those in opposition argued that granting the permit for the proposed bed and breakfast would effect an increase in crime, a decrease in property values, an increase in taxes and an overall danger to the community. The members of the Will County Planning and Zoning Commission voted unanimously to deny the special use permit.

The Will County Land Use Committee conducted a hearing to review the factual findings from the August 3, 1999, hearing. The committee found no error. The Committee's determination was based on the opinions of an attorney apparently hired by neighbors who

opposed plaintiffs' bed and breakfast. Plaintiffs complain that the attorney's findings were not based on fact, but on the concerns of "panicked neighborhood residents."

Plaintiffs appealed the committee's findings by filing an allegedly timely notice of appeal with the Will County Clerk on October 21, 1999. The Will County Board considered the appeal one hour later and unanimously voted to deny the permit. Plaintiffs allege that because the appeal was considered so quickly they did not have time to put together their case. Their argument to the Will County Board would have included outlining the benefits that two handicapped-accessible rooms would have conferred to persons with disabilities. In their last attempt to appeal the denial of the special use permit, plaintiffs sent a certified letter to the Chairwoman of the Land Use Committee requesting that she schedule a hearing of the appeal before the Land Use Committee or the Will County Board, but have never received a response.

**Count I -- Fair Housing Act**

Plaintiffs first claim that they are entitled to relief under the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, et seq., alleging that the denial of their application for a special use permit was "invidious on the rights of the handicapped and disabled to obtain alternative temporary lodging in a bed and breakfast establishment." The FHA makes it unlawful:

> [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of -- (A) that person; or (B) a person intending to reside in that dwelling after it is sold, rented or made available; or (C) any person associated with that person.

42 U.S.C. § 3604(f)(2)(A) through (C). Defendants correctly point out that, to receive protection from this section of the FHA, plaintiff's proposed bed and breakfast must fall within the statutory definition of "dwelling." 42 U.S.C. § 3602(b) provides that:

4

> "Dwelling" means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

In the instant case, plaintiffs planned to have a two-building bed and breakfast. Their farmhouse was to be used as a residence for Schneider, and the barn was to be used as the customer portion of the bed and breakfast.

Defendants correctly contend that because the configuration of plaintiffs' proposed bed and breakfast does not qualify as a "dwelling," even if there was a discriminatory purpose in denying the permit the structure does not fall within the FHA. Whether a building is a "dwelling" depends on the length a person stays at a residence, and whether that person intends to return to the home. Lauer Farms, Inc. v. Waushara Cty. Bd. of Adjustment, 986 F. Supp. 544, 559 (E.D. Wis. 1997). Lauer found housing for migrant workers within the definition of "dwelling" because the workers lived in the housing for four to five months at a time, and because this housing was the type that they would "return to" every night.

The often-cited Patel v. Holley House Motels, 483 F. Supp. 374 (S.D. Ala. 1979), considered whether a hotel fell within the definition of dwelling. It defined "dwelling" as a "temporary or permanent dwelling place, abode or habitation to which one intends to return, as distinguished from a place of temporary sojourn or transient visit." Id. at 381. Patel found that a hotel was not within the FHA definition of "dwelling" because there were no plaintiffs who intended to reside in the hotel. Id.

The proposed bed and breakfast does not fit within the FHA definition of "dwelling." First, it is highly unlikely that any customers of the bed and breakfast would "intend to return," as

5

the migrant workers did in the Lauer Farms case because of the transient nature of a bed and breakfast. Occupants do not generally stay at bed and breakfasts for months at a time. Second, bed and breakfasts are akin to hotels in that they are places of "temporary sojourn or transient visit." Indeed, plaintiffs allege in their complaint that the denial of the special use permit would deprive handicapped visitors of "temporary lodging." Because the building in question does not fall within the FHA definition of "dwelling," plaintiffs' FHA claim fails and defendants' motion to dismiss is granted with respect to Count I.

**Count II -- Americans with Disabilities Act Claim**

Plaintiffs have also invoked the ADA, claiming that the Will County Board denied their special use permit because their bed and breakfast plans included two handicapped-accessible rooms. Only one handicapped accessible room is required by law for this size establishment. See 28 C.F.R. Part 36, App. A, § 9.1.2. Congress' overall purpose in enacting the ADA was to "establish a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title I of the ADA aims to stop employment discrimination, Title II prohibits discrimination by public entities, and Title III was enacted to stop discrimination by private entities that provide public accommodations and services. 42 U.S.C. §§ 12111, 12132, 12181, *et seq.* Since plaintiffs allege that the Will County Board, a public entity, unlawfully discriminated against them, they bring their claim under Title II.

Title II of the ADA states that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

6

42 U.S.C. § 12132. Defendants argue that plaintiffs are too remote from those customers with whom they claim to be associated because they are potential customers, rather than specific, qualified individuals with disabilities. Thus, defendants challenge plaintiffs standing to bring this claim, arguing that they are attempting to assert the legal rights of others.

Standing refers to the limitations on whether federal courts *may* and *should* hear cases. Article III constitutional standing precludes courts from adjudicating cases where there is no actual case or controversy. Lujan v. Defenders of Wildlife, 540 U.S. 555, 560 (1992). Defendants do not contest plaintiffs' Article III standing. Even if the court *may* hear a case, judicially imposed prudential limitations exist to help courts decide whether they *should* exercise jurisdiction. Allen v. Wright, 468 U.S. 737, 751 (1984). These constraints include "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." Id. "Persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others." Warth v. Seldin, 422 U.S. 490, 522 (1970). Therefore, if plaintiffs' ADA claim falls within the zone of interest that Title II was intended to protect, they have standing to bring the claim.

Title I of the ADA makes it unlawful for an individual or entity to "exclude[] or otherwise deny[] equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 12112(b)(4). Similarly, Title III states that "[i]t shall be discriminatory to exclude

7

or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(2). These sections have come to be known as "association provisions."

Congress did not include an association provision in Title II, however. Congress instead deferred the task of writing regulations implementing Title II to the Department of Justice, with instructions that "[T]itle II should be read to incorporate provisions of Titles I and III which are not inconsistent with the regulations implementing Section 504 of the Rehabilitation Act of 1973, such as Section 102(b)(4) of the ADA [codified as 42 U.S.C. 12112(b)(4), (quoted supra)]." H.R. Report No. 101-485(III), 101st Cong., 2nd Sess. 51 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 474. Congressional reference to the exact regulation in question is proof enough of its intent to include such a provision. Innovative Health Systems, Inc. v. City of White Plains, 117 F.3d 37, 47-48 (2d Cir. 1997). Indeed, the regulations implementing Title II's association provision take the language of 42 U.S.C. § 12112(b)(4) directly:

> A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the *known* disability of an individual with whom the individual or entity is *known* to have a relationship or association. [28 C.F.R. § 35.130(g)(emphasis added).]

Defendants' argument appears to question whether plaintiffs fall within the meaning of the word "known" as it appears in the regulation. The first use of "known" in the regulation means that the defendant must know that there is someone with whom the plaintiff is associated who has a disability. The second use refers to the extent to which a defendant must be aware of the association between the plaintiff and the qualified individual with a disability. With respect

8

to the first use of "known," defendants argue that a plaintiff must identify a *specific person* with a *specific disability* in order to satisfy the requirement imposed by the first use of "known."

In support of this contention, defendants cite Oak Ridge Care Ctr. Inc. v. Racine County, 896 F. Supp. 867, 872 (E.D. Wis. 1995), where a drug and alcohol rehabilitation center whose sale of land was allegedly and unlawfully torpedoed because of its clientele with disabilities was held to have standing. Defendants attempt to distinguish Oak Ridge from the instant case because the rehabilitation center had an existing clientele. Certainly this is a reasonable distinction, but it is not dispositive of this case. Indeed, trial courts within this Circuit have held that the regulation also protects the known association between a proposed business and its targeted customers. Discovery House, Inc. v. Consolidated City of Indianapolis, 43 F. Supp. 2d 997 (N.D. Ind. 1999). Discovery House held that a proposed drug rehabilitation center may state a claim of discrimination under Title II's association provision even though a significant portion of the potential customers would not be qualified individuals with disabilities under the ADA. Id. at 1002. Thus, a plaintiff may state a claim under the ADA's association provisions based on his association with prospective customers with disabilities in cases where there is a logical relationship between the proposed business and customers with disabilities.

Defendants fail to cite any authority limiting association provisions from covering this type of discrimination. The most analogous cases this court has found barred individuals who alleged that they were discriminated against because of their advocacy on behalf of individuals with disabilities. Freilich v. Board of Directors of Upper Chesapeake Health, Inc., 142 F. Supp. 2d 679 (D. Md. 2001); Oliveras-Sifre v. Puerto Rico Dept. of Health, 214 F.3d 23 (1st Cir. 2000). However, Freilich and Oliveras-Sifre are distinguished from the instant case because the

9

plaintiffs in those cases were seeking protection under the ADA based on an alleged "association" with a class of people with disabilities for whom they were advocating. There was no actual or even proposed relationship between the plaintiffs-advocates and the intended beneficiaries of their advocacy. In the instant case, as in <u>Discovery House</u>, although there was no current relationship or association between the plaintiffs and the individuals with disabilities that they intended to serve, there was an intended, prospective, actual commercial relationship between the plaintiffs and the individuals who they intended to serve as customers or clients that constituted the alleged motivation for the discrimination. Put another way, it was the plaintiffs' known, intended association with individuals with disabilities that formed the basis of the alleged discriminatory actions by the defendants.

Moreover, the Justice Department's regulations contemplate allowing association claims in cases such as this. The regulations implementing Title II of the ADA indicate that the agency intended to extend protection to a broad range of plaintiffs and associations. The Appendix to 28 C.F.R. § 35.130 states:

> Paragraph (g), which prohibits discrimination on the basis of an individual's or entity's known relationship or association with an individual with a disability, is based on sections 102(b)(4) [codified at 42 U.S.C. § 12112(b)(4)] and 302(b)(1)(E) [codified at 42 U.S.C. § 12182] of the ADA. This paragraph was not contained in the proposed rule. The individuals covered under this paragraph are *any individuals who are discriminated against because of their known association with an individual with a disability*. For example, it would be a violation of this paragraph for a local government to refuse to allow a theater company to use a school auditorium on the grounds that the company had recently performed for an audience of individuals with HIV disease.

28 C.F.R. § 35.130 app. A at 526 (2001)(emphasis added). The emphasized portion of the appendix indicates that the regulation was intended to cover any individual who is discriminated against because he is associated with individuals with disabilities. The Appendix continues:

10

> This protection is not limited to those who have a familial relationship with the individual who has a disability. *Congress considered, and rejected, amendments that would have limited the scope of this provision to specific associations and relationships.* Therefore, if a public entity refuses admission to a person with cerebral palsy and his or her companions, the companions have an independent right of action under the ADA and this section.

Id. (emphasis added). This paragraph illustrates the intended broad scope of the regulation, confirming the agency's intent to include nonspecific associations and relationships such as the association between a planned business and its potential customers. The final paragraph of the Appendix that deals with Title II's association provision reiterates that commercial "entities" are to be covered:

> During the legislative process, the term "entity" was added to section 302(b)(1)(E) [codified at 42 U.S.C. § 12182] to clarify that *the scope of the provision is intended to encompass not only persons who have a known association with a person with a disability, but also entities that provide services to or are otherwise associated with such individuals.* This provision was intended to ensure that entities such as health care providers, employees of social service agencies, and others who provide professional services to persons with disabilities are not subjected to discrimination because of their professional association with persons with disabilities.

Id. at 526-27 (emphasis added). The Technical Manual entry for Title II's association provision also indicates the Justice Department's intended broad coverage of the regulation:

> A State or local government may not discriminate against individuals or entities because of their known relationship or association with persons who have disabilities. This prohibition applies to cases where the public entity has knowledge of both the individual's disability and his or her relationship to another individual or entity. In addition to familial relationships, *the prohibition covers any type of association between the individual or entity that is discriminated against* and the individual or individuals with disabilities, if the discrimination is actually based on the disability.
>
> ILLUSTRATION 1: A county recreation center may not refuse admission to a summer camp program to a child whose brother has HIV disease.

11

> ILLUSTRATION 2: A local government could not refuse to allow a theater company to use a school auditorium on the grounds that the company has recently performed at an HIV hospice.
>
> ILLUSTRATION 3: If a county-owned sports arena refuses to admit G, an individual with cerebral palsy, as well as H (his sister) because G has cerebral palsy, the arena would be illegally discriminating against H on the basis of her association with G.

TA Manual § II-3.9000 at 7 (1993)(emphasis added). Certainly, the expected association between a startup business and its potential customers falls within the broad meaning of the phrase "any type of association."

Moreover, discrimination because of association in the real world is not limited to instances where there is a long-lasting relationship between an individual with a disability and an entity against whom the government entity discriminates. It is just as unlawful for a local government to disallow use of a public auditorium to a theater company because it has booked a performance for individuals with HIV disease as it would be if the discrimination happened after the performance, as in Illustration 2 above. TA Manual § II-3.9000 at 7, Illus. 2 (1993). Indeed, discrimination of the sort alleged here might conceivably be more damaging to individuals with disabilities than direct discrimination. An entrepreneurial wheelchair retail outlet that is denied a zoning permit because of its association with potential customers that are certain to have disabilities should not be denied a remedy simply because it has yet to sell any wheelchairs. Its association with individuals with disabilities is known in the sense that one of its intended and significant purposes is to accommodate the specific needs of persons with disabilities.

To rule otherwise would allow public entities with discriminatory intent to effectively block startup companies that service people with disabilities from entering the market at all. The chilling effect on commerce that is associated with persons with disabilities is one of the very

12

evils that the association provisions of the ADA seek to protect. Therefore, a proposed entity designed to accommodate the specific needs of qualified individuals with disabilities shall be given the same protection under Title II's association provision as an entity that has an association with specifically identifiable individuals with disabilities.

Reading the pro se complaint liberally, plaintiffs allege that their business will be marketed toward customers who have disabilities. They picked the plot of land for the bed and breakfast because of its proximity to a veteran's cemetery, which they believe will attract a more than average number of customers with disabilities. In any event, the proposed bed and breakfast, for which the special use permit was requested, had two handicapped-accessible rooms rather than the required one. Since plaintiffs' proposed entity was designed to accommodate the specific needs of qualified individuals with disabilities, plaintiffs' association with their customers is sufficient to confer standing in this case. The court notes that plaintiffs bear a heavy burden to prove that defendants' actions were based on unlawful discrimination against individuals with disabilities, and holds only that the complaint, liberally construed, is sufficient to withstand a motion to dismiss under Fed.R.Civ.P. 12(b)(6) on the issue of standing.

Even when a plaintiff has standing to bring a claim, he must allege the unlawful conduct properly and completely. Plaintiffs wishing to invoke Title II's association provision must allege that: (1) a logical and significant association with an individual with disabilities; (2) that a public entity knew of that association; (3) that the public entity discriminated against them because of that association; and (4) they suffered a direct injury as a result of the discrimination. 28 C.F.R. § 35.130. This court will follow its sister court in the Eastern District of Wisconsin with respect to the first requirement, holding that zoning decisions by local governments are "activities"

13

performed by public entities. See Oak Ridge, 896 F. Supp. at 873. Thus, the first requirement has been met.

Second, the instant plaintiffs sufficiently allege that the Will County Board knew of their plans to provide special accommodations for customers with disabilities, thus satisfying the requirement that the public entity knew of the association, and that they were discriminated against because of that association. Finally, plaintiffs have alleged that their business plans have been disrupted as a direct result of the Will County Board's discrimination., satisfying the requirement that plaintiffs themselves suffer injury as a result of the public entity's discrimination. Therefore, because plaintiffs have satisfied each of the necessary elements of a prima facie case under the association provision of Title II of the ADA, defendants' motion to dismiss with respect to plaintiffs' ADA claim is denied.

**Due Process Claims**

Plaintiffs allege that the Will County Board violated the due process clause of the Fourteenth Amendment in denying them a special use permit, denying them full use of their land and failing to rule on their remodeling permit. These claims fail because they are not yet ripe for adjudication.

In addition to standing, several other jurisdictional requirements exist in order to weed out improper claims. One such requirement, designed to filter out cases that are not yet ready for adjudication, is called "ripeness." See Williamson County v. Hamilton Bank, 473 U.S. 172, 188-89 (1985). Williamson set forth special ripeness requirements with which courts are to consider substantive due process allegations. Forseth v. Village of Sussex, 199 F.3d 363, 372 (7th Cir. 2000). In order to for a substantive due process claim relating to a municipality's zoning

14

decision to be ripe, the plaintiff must satisfy two requirements: (1) the "Final Decision Requirement" mandates that the plaintiff demonstrate that he or she received a final decision from the relevant government entity; and (2) the "Exhaustion Requirement" requires that the plaintiff must have sought redress through state procedures before resorting to a due process claim under the United States Constitution. Id.

Fulfilling the exhaustion requirement is more procedure-intensive than the final decision requirement. The Illinois Counties Code provides that the decisions of the county board are subject to judicial review under Illinois' Administrative Review Law. 55 ILCS 5/1-6007. The Illinois Administrative Review Law confers jurisdiction for review of administrative decisions in the circuit courts of Illinois. 735 ILCS 5/3-104. However, for a decision to be considered by the circuit courts, the complaining party must have explored all possible administrative rehearing and review possibilities. Id.; see County of Knox v. Highlands, L.L.C., 188 Ill. 2d 546, 551, 723 N.E.2d 256, 260 (1999). Plaintiffs must have exhausted these appellate procedures before bringing their due process case in federal court. Forseth, 199 F.3d at 372.

Plaintiffs here allege that their rights have been violated with respect to both the remodeling permit and the special use permit. Plaintiffs have not received word from the county on their remodeling permit, and have correctly filed for a declaratory judgment in the Circuit Court of Will County asking that the remodeling permit be issued. Thus, with respect to the remodeling permit, plaintiffs have not fulfilled either of the necessary requirements for this court to consider the constitutionality defendant's denial of that permit. Accordingly, this court does not have jurisdiction to consider plaintiffs due process claim with respect to the remodeling permit until plaintiffs exhaust their state court remedies.

15

In order for this court to hear plaintiffs' allegations with respect to the denial of their special use permit application, they must also have satisfied both the final decision and exhaustion of remedies requirements. The Will County Board was the correct government agency to consider whether to issue the special use permit, and the denial of the permit was final, thus fulfilling the final decision requirement. However, plaintiffs have not filed suit in Illinois state court, and therefore have not satisfied the exhaustion requirement.

**Equal Protection**

Plaintiffs also allege that their rights under the equal protection clause of the Constitution were violated. Generally, to state a claim for violation of the equal protection clause of the 14th Amendment, the plaintiff must allege membership in a protected class that has been singled out for unequal treatment by the government. City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 440-41 (1985). The Supreme Court has also recognized a "class of one" claim, where a claim may be sufficient if the plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the different treatment. Village of Willowbrook v. Olech, 528 U.S. 562 (2000). Additionally, the Seventh Circuit recognizes that an individual also may state a claim under the equal protection clause if he can show that state government took an action that was a spiteful effort to "get" him for reasons wholly unrelated to any legitimate state objective. Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001). "To prevail, the plaintiff must demonstrate that the government is treating unequally those individuals who are prima facie identical in all relevant respects, and that the cause of the differential treatment is a totally illegitimate animus toward the plaintiff by the defendant" Id. (Internal citations omitted.) If the defendant would have taken the complained-of

16

action anyway, even if it had not had illegitimate animus, the animus would not condemn the action. Id. Ill will must be the sole cause of the complained-of action. A showing of "uneven law enforcement," standing alone, will not suffice. Id.

In the instant case, plaintiffs have not alleged that they were treated any differently from anyone similarly situated, and therefore 14th Amendment claim is insufficient.

**Other Claims**

Finally, plaintiffs complain that the Will County ordinances are more restrictive than the state laws passed with regard to bed and breakfasts, and are therefore improper. State law provides that bed and breakfasts shall have no more than five rooms, whereas Will County ordinance states that the county maximum number of rooms is four. 50 ILCS 820/2; Will County Ordinance 8.21(c). Plaintiffs point out further the discrepancy that Illinois law requires that the operator of a bed and breakfast live "on contiguous property" from the bed and breakfast establishment, whereas the Will County ordinance mandates that the operator/owner "shall live on the premises where the bed and breakfast is active." 50 ILCS 820/2; Will County Ordinance 8.21(f). There are, however, no improper discrepancies here. The Illinois bed and breakfast act explicitly allows the county to regulate bed and breakfasts in unincorporated areas: "The corporate authorities of any county or municipality shall...[p]rovide for the regulation, safe operation, licensing and inspection of bed and breakfast establishments." 50 ILCS 820/3(1). In enacting both ordinances, Will County has done exactly what it was asked to do by the Illinois legislature according to 50 ILCS 820/3(1). Therefore, this claim has no merit.

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss with respect to plaintiffs' claim under the association provision of the ADA is denied. Defendants' motion to dismiss all other claims is granted. Defendants are directed to file an answer to the remaining claim on or before April 11, 2002. This matter is set for a report on status April 18, 2002, at 9:00 a.m.

**ENTER:** **March 14, 2002**

*[signature]*

**Robert W. Gettleman**
**United States District Judge**